**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:11CR65 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | FINDINGS AND |
| | ) | |
| DOUGLAS I. SUING, | ) | RECOMMENDATION |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the motion to suppress filed by defendant Douglas I. Suing (Suing) ([Filing No. 25](#)). Suing is charged in the Indictment with the production and manufacturing of child pornography in violation of [18 U.S.C. § 2251(a)](#) (Count I), the receipt and distribution of child pornography in violation of [18 U.S.C. § 2252A(a)(2)](#), and the possession of child pornography in violation of [18 U.S.C. § 2252(a)(4)(B)](#). Suing seeks to suppress evidence obtained following a traffic stop by officers of the Navajo County Sheriff's Office in Arizona on January 12, 2011, the execution of a Navajo County search warrant of a digital media storage device found in Suing's Nissan automobile on January 12, 2011, the execution of federal search warrants for Suing's apartment in Omaha, Nebraska, on January 25, 2011, and January 27, 2011.

The court held an evidentiary hearing on the motion on August 15, 2011. Suing was present for the hearing along with his counsel, Federal Public Defender David R. Stickman. The United States was represented by Assistant U.S. Attorney Michael P. Norris. During the hearing, the court heard the testimony of Deputies Caleb Davis (Deputy Davis), William Murray (Deputy Murray), and Thomas Peterson (Deputy Peterson) of the Navajo County Sheriff's Office (NCSO) located in Holbrook, Arizona; Special Agent Maynard Vincent Davenport, Jr. (Agent Davenport) of the Federal Bureau of Investigation (FBI); Deputy Mark Dishaw (Deputy Dishaw) of the Douglas County Sheriff's Office (DCSO); and Investigator Nathan Malicky (Investigator Malicky) of the Nebraska State Patrol (NSP). The court also received into evidence the following exhibits: a copy of an FBI administrative subpoena (Exhibit 1); a copy of a Douglas County Attorney subpoena dated May 5, 2011 (Exhibit 2); a copy of a Douglas County Attorney subpoena dated January 24, 2011 (Exhibit 3); a time

line chart (Exhibit 4); a copy of the search warrant in 8:11MJ9 (Filing No. 26) (Exhibit 5); a copy of the search warrant in 8:11MJ11 (Filing No. 26) (Exhibit 6); a consent to search form (Exhibit 7); an affidavit (Exhibit 8); a CD recording of an interview (Exhibit 10); a copy of a traffic warning (Exhibit 11); a copy of a video traffic stop (Exhibit 101); a partial transcript of an interview of Deputy Murray (Exhibit 102); and a copy of Section 28-730 of the Arizona Revised Statutes (Court Exhibit A). The court also took judicial notice of Investigator Malicky's testimony at the detention hearing (Filing No. 45). A transcript (TR.) of the hearing was filed on August 23, 2011 (Filing No. 47).

## FINDINGS OF FACT

In December 2009, Suing came to the attention of the FBI Cyber Crimes Task Force (CCTF) in Omaha when an FBI administrative subpoena (Exhibit 1) was used to obtain information from Cox Communications concerning a subscriber to an IP address (TR. 149). The IP address had been developed as a site involved in a peer-to-peer investigation of child pornography (TR. 148). The IP address was subscribed to by Suing (TR. 151). The CCTF conducted surveillance and record checks following the response to the subpoena (TR. 158-159). It was determined Suing had moved from the address being investigated (TR. 159). In May 2010, a Douglas County Attorney subpoena was issued to Cox Communications to obtain various information concerning Suing (TR. 159-162; Exhibit 2). An additional Douglas County Attorney subpoena was issued to Cox Communications on January 24, 2011, for the latest IP information on Suing (TR. 166-167; Exhibit 3). Investigator Malicky prepared an application for a federal search warrant detailing the CCTF's investigation to date (TR. 171; Exhibit 5). Through a media release, Investigator Malicky became aware of Suing's recent arrest in Arizona and contacted FBI Agent Davenport in Arizona (TR. 171-172). Investigator Malicky included some of the details from that Arizona arrest (Exhibit 5 - Aff. ¶¶ 46-48) in the Affidavit for the Omaha search warrant (TR. 173; Exhibit 5). U.S. Magistrate Judge F.A. Gossett issued a search warrant for Suing's residence at 10923 Western Plaza, Apartment 20, in Omaha, on January 24, 2011 (Exhibit 5). The search warrant was executed on January 25, 2011, and items were seized from the residence (Exhibit 6). As a result of a review of such items, it was

determined there would be additional equipment at the residence, including cameras, which was not seized on January 25, 2011, and Investigator Malicky applied for and received an additional federal search warrant on January 27, 2011, in order to return to the apartment and seize cameras and other equipment (Exhibit 6). The search warrant was executed on January 27, 2011; a camera and other equipment were seized (Exhibit 6).

On January 21, 2011, Deputies Davis and Murray were patrolling Interstate 40 in northern Arizona in separate patrol vehicles observing eastbound traffic (TR. 10). Deputy Davis was accompanied by his canine, a four-year old Belgian Malinois trained to detect narcotics (TR. 11). Around 10:50 a.m., Deputy Davis, while parked in the median, observed a red Nissan eastbound following a semi-truck (TR. 11). Deputy Davis determined the Nissan was following too closely, i.e., only a half second behind the semi-truck (TR. 12). Both the Nissan and the semi-truck were traveling at seventy-five miles per hour, the posted speed limit for Interstate 40 at that location (TR. 12). Deputy Davis observed the Nissan change from the slow lane to the fast lane and follow another semi-truck, too closely, in the fast lane (TR. 12). Deputy Davis gave pursuit and stopped the Nissan at 1054 hours near mile post 305 after turning on the patrol car's emergency lights (TR. 13-14). The Nissan, bearing Nebraska license plates and driven by Suing, promptly pulled over to the side of the Interstate (TR. 14). Deputy Davis walked to the passenger side of the Nissan and asked Suing, the lone occupant of the Nissan, for documents (TR. 14). Deputy Davis described the Nissan as being full of items, i.e., items on the passenger seat, the back seat, and a few in the rear, as if Suing was moving somewhere (TR. 14). Deputy Davis described Suing as being visibly nervous with his hands shaking, avoiding eye contact, and hesitant in answering questions (TR. 15). Deputy Davis told Suing a warning would be issued for following too closely and directed Suing to come back to Deputy Davis' patrol car (TR. 15). Deputy Davis noted Suing's nervousness continued even after being told only a warning would be issued (TR. 15).

Suing walked back to Deputy Davis' patrol car (TR. 16). Deputy Davis noticed Suing kept his hands in his pockets when walking back to the patrol car (TR. 17). Both Suing and Deputy Davis stood outside the patrol car (TR. 19). Deputy Davis ran a radio check of Suing and the Nissan for wants and warrants, prepared a warning citation for following too

closely, and engaged Suing in conversation about Suing's itinerary (TR. 16). Deputy Davis observed Suing kept his arms crossed and made (as Deputy Davis described them) some off-the-wall comments (TR. 17-18). It took approximately twelve minutes for Deputy Davis to receive a clearance from dispatch on the radio checks (TR. 19). Deputy Davis gave Suing a warning citation (Exhibit 11).

Deputy Davis asked Suing for consent to search the Nissan (TR. 21). Suing agreed and signed a consent to search form provided by Deputy Davis (TR. 22-23; Exhibit 7). Deputy Davis waited for a back-up deputy to arrive and then began to search the Nissan (TR. 25). Deputy Davis found packages and clothing everywhere in the Nissan (TR. 25). He found the back seat was broken and found that the area where the spare tire would be located was inaccessible (TR. 25). Deputy Davis, based on past experiences with hidden compartments in vehicles, thought these matters were suspicious (TR. 25). Deputy Davis then deployed his canine (TR. 26). Deputy Davis placed his canine on a leash and deployed him at 11:20 a.m. (TR. 26). The canine ran around the vehicle and alerted on the passenger side of the Nissan as well as inside the Nissan at the back seat where the seat would not lay down (TR. 26). Deputy Davis placed his canine back in the patrol car and called his supervisor Deputy Peterson to have someone come to the stop area and drive the Nissan back to the Sheriff's office so the Nissan could be more thoroughly examined (TR. 27). The Nissan was driven back to the garage at the Sheriff's office and Suing was driven there in Deputy Davis' patrol car (TR. 27-28). Upon arrival at the Sheriff's office, Suing was placed in an interview room and not handcuffed (TR. 28).

The Nissan was searched again and the deputies found a computer hard drive in a bag on the front passenger seat (TR. 29). It was not unusual for the deputies to find hard drives when searching for narcotics as such hard drives often contain photographs and drug records (TR. 30). No controlled substances were found in the Nissan. The hard drive was turned over to Deputy Peterson for review since he had some training in reviewing such items (TR. 30, 102). Deputy Peterson plugged the hard drive into his computer and downloaded the files (TR. 103). When Deputy Peterson clicked on the first folder, numerous secondary folders appeared (TR. 103). When Deputy Peterson clicked on the first secondary folder, a screenful of thumbnail photographs appeared which Deputy

Peterson described as being pornographic pictures of young boys (TR. 104). Deputy Peterson immediately shut the computer down (TR. 104). Deputy Peterson informed Deputy Murray of what he found, and Deputy Murray then contacted a deputy Navajo County attorney for advice (TR. 74). Following the advice from the deputy county attorney, Deputy Murray assisted Deputy Davis in preparing an application for a search warrant (TR. 74).

Deputy Davis prepared an application for a search warrant and presented it to a Superior Court judge who issued a search warrant for the hard drive (TR. 32; Exhibit 8 - [Filing No. 35](#)). The search warrant authorized the search of the hard drive for the presence of child pornography. Deputy Davis returned to the Sheriff's office with the search warrant, and Deputy Peterson thoroughly searched the hard drive and found thousands of pictures of child pornography (TR. 107). In the meantime, deputies in the Navajo County Sheriff's Office contacted the FBI to see if it was interested in the case (TR. 105). FBI Agent Davenport received the call and agreed to come to the Navajo County Sheriff's Office (TR. 116). It took Agent Davenport about forty-five minutes to drive to the Navajo County Sheriff's Office from his location at the FBI's Pinetop Lakeside Resident Agency office (TR. 117). Upon arrival, Agent Davenport was briefed by the deputies (TR. 117).

Agent Davenport arrived before the issuance of the search warrant and decided to interview Suing (TR. 118). Suing was seated in the interview room when Agent Davenport entered (TR. 119). Suing was allowed to use the restroom before Agent Davenport began the interview (TR. 119). When Suing returned to the room, Agent Davenport advised Suing of *Miranda* rights, Suing stated he understood them, and agreed to talk with Agent Davenport (TR. 123). The interview was recorded (Exhibit No. 10). Suing began by saying "You go first" (TR. 123). Agent Davenport asked Suing if Suing would have a problem if the officers took a look at his hard drive (TR. 125). Suing said he would have a problem with that (TR. 125). When asked why, Suing told Agent Davenport there might be some pictures of him on the hard drive (TR. 125). When Agent Davenport told Suing that they were not concerned with pictures of him, Suing stated there was "some other stuff on there" (TR. 125). Suing said there were some naturist pictures on the hard drive and he wasn't sure of some of the ages of the individuals pictured (TR. 125). Upon prodding by

Agent Davenport, Suing stated he did not want the officers to look at the hard drive (TR. 126). During the interview, Suing made mention of a lawyer several times in that he asked Agent Davenport if he should get a lawyer (TR. 127). Agent Davenport informed Suing that was up to Suing (TR. 127). When Agent Davenport asked Suing if he wanted to talk anymore, Suing continued to talk (TR. 128). After some time into the interview, when Suing unequivocally said he wanted to talk to a lawyer, Agent Davenport ended the interview (TR. 128-129).

## LEGAL ANALYSIS
### A. The Arizona Investigation

Suing alleges the traffic stop and resulting detention and interrogation violate his Fourth Amendment rights. Suing further alleges since the information illegally gathered from the Arizona stop was included in the federal search warrants for his apartment in Omaha, the evidence seized pursuant to the Omaha search warrants should be suppressed.

A law enforcement officer's observation of a traffic violation provides probable cause to stop a vehicle. *United States v. Frasher*, 632 F.3d 450, 453 (8th Cir. 2011); **see** *United States v. Long*, 532 F.3d 791, 795 (8th Cir. 2008) (**citing** *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977)). An officer's subjective motivations do not affect the reasonableness of a traffic stop based on the violation of the traffic laws. *Frasher*, 632 F.3d at 453. Moreover, the stop is valid even if the police would have ignored the traffic violation but for the suspicion that greater crimes were afoot. *Id.* Deputy Davis observed a traffic violation in that the Nissan was following too closely to various vehicles on Interstate 40 in Arizona on January 21, 2011. Following too closely is a traffic violation under Arizona law. **See** Ariz. Rev. Stat. Ann. § 28-730; TR. 213-214; Exhibit A. The court credits Deputy Davis' testimony regarding the traffic violation. The traffic stop was legal.

Suing was detained pending Deputy Davis' completion of the warning citation and records check. Contemporaneous with a valid traffic stop, Deputy Davis could "conduct an investigation that is reasonably related in scope to the circumstances that initially justified the stop." *United States v. Bracamontes*, 614 F.3d 813, 816 (8th Cir. 2010). In

fact, a police officer may detain the occupants while completing a number of routine tasks such as computerized checks of the vehicle registration, driver's license and criminal history, and issuing a citation. *United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008); **see also** *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Additionally, the police officer may inquire about the driver and other occupant's destination, purpose of the trip, and whether the police officer may search the vehicle. *Bracamontes*, 614 F.3d at 816; *United States v. Gill*, 513 F.3d 836, 845 (8th Cir. 2008); *United States v. Williams*, 431 F.3d 296, 298 (8th Cir. 2005); *United States $404,905.00 in v. U.S. Currency*, 182 F.3d 643, 647 (8th Cir. 1999).

"If the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry to satisfy those suspicions." *United States v. Ward*, 484 F.3d 1059, 1061 (8th Cir. 2007) (**quoting** *United States v. Johnson*, 58 F.3d 356, 357 (8th Cir. 1995)); Specifically, an officer may take further action as necessitated by the information volunteered by the motorist, observations of the contents of the vehicle, perceptions made the police officer regarding illegal drug use, and divergent information from the passengers. *$404,905.00*, 182 F.3d at 647; **see** *Bracamontes*, 614 F.3d at 816 (noting reasonable suspicion established to detain motorist for further investigation when motorist and passenger gave contradictory accounts). In any event, the scope and length of any investigation must be reasonable. *United States v. Chavez Loya*, 528 F.3d 546, 553 (8th Cir. 2008). "The investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *United States v. Ward*, 484 F.3d 1059, 1062 (8th Cir. 2007) (**quoting** *United States v. Bloomfield*, 40 F.3d 910, 916 (8th Cir. 1994) (en banc)); **see** *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 459 (8th Cir. 2011). "A constitutionally permissible traffic stop can become unlawful, however, 'if it is prolonged beyond the time reasonably required to complete' its purpose." *United States v. Shafer*, 608 F.3d 1056, 1062 (8th Cir. 2010) (**quoting** *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).

In Suing's case, Deputy Davis asked Suing for consent to search the Nissan immediately following the giving of the warning citation for following too closely. "While the Fourth Amendment does not permit warrantless searches, law enforcement may

conduct such a search if they obtain [the owner's] voluntary consent." *United States v. Quintero*, 648 F.3d 660, 667 (8th Cir. 2011). The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and such "[v]oluntariness is a question of fact to be determined from all the circumstances." *Ohio v. Robinette,* 519 U.S. 33, 40 (1996). From all the circumstances of the case, the court finds Suing's consent was voluntarily given. In this case, Deputy Davis obtained both oral and written consent to search. The written consent signed by Suing gave the Navajo County Sheriff's Office permission to search the Nissan "to include luggage, containers, and contents of all." (Exhibit 7). Suing's consent was never withdrawn until he objected to the examination of the hard drive during his interrogation by Agent Davenport at the Navajo County Sheriff's Office later in the day.

"Conduct withdrawing consent must be an act clearly inconsistent with the apparent consent to search, an unambiguous statement challenging the officer's authority to conduct the search, or some combination of both." *United States v. Sanders,* 424 F.3d 768, 774 (8th Cir. 2005). While Suing's consent was in force, Deputy Davis deployed his canine at the traffic stop location. The canine alerted and apart from any consent of Suing, the alert provided probable cause to thoroughly search the Nissan and its contents for drugs or drug evidence, such as records and photographs. A police service canine's alert to the odor of drugs in a vehicle provides probable cause that drugs are present. *United States v. Place*, 462 U.S. 696, 707 (1983). After probable cause is established, a car can be searched without a warrant under the automobile exception to the warrant requirement. *Chambers v. Maroney*, 399 U.S. 42, 52 (1969); *United States v. Sanchez*, 417 F.3d 971, 976 (8th Cir. 2005). The fact that no drugs were found does not nullify the probable cause developed at the time of the dog sniff. The Navajo County Sheriff's deputies examined the hard drive for drug records or photographs, which would be evidence of drug trafficking. **See** *United States v. Burgess*, 576 F.3d 1078, 1092-1095 (10th Cir. 2009). Once they saw the photos of child pornography, the search of the hard drive ceased and the deputies applied for a search warrant to further search the hard drive. The search warrant issued by the Navajo County Superior Court judge was based on probable cause and authorized the deputies to further search the hard drive. The evidence obtained was lawfully obtained

and admissible against Suing at trial and did not taint the affidavits used to obtain the federal search warrants several days later in Omaha.

Suing asserts that his statements to Agent Davenport should be suppressed. The touchstone for the admissibility of a defendant's statements is voluntariness. *Brown v. Mississippi*, 297 U.S. 278 (1936). The court must look to the totality of circumstances in determining whether or not the statements were voluntary. *Mincey v. Arizona*, 437 U.S. 385 (1978); *Colorado v. Connelly*, 479 U.S. 157 (1986); *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). In this case, Suing was advised of his constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). Suing understood those rights and spoke with Agent Davenport. At several times during the interview, Suing brought up the issue of a lawyer. However, Suing's mention of a lawyer did not amount to an unambiguous request for a lawyer. The request must be unambiguous for the interview to stop. **See** *Davis v. United States*, 512 U.S. 452, 458 (1994); *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1994). Suing's statement of "[m]aybe I should talk to a lawyer" was not such an unambiguous request for a lawyer or a request for the interview to stop. When Suing asked whether he could talk to a lawyer, Agent Davenport attempted to clarify Suing's statement, but Suing did not directly answer Agent Davenport's question and went on talking. When Suing requested the interview to stop so he could talk with a lawyer, Agent Davenport honored that request and ceased the interview. Suing's constitutional rights were not violated during the interview, and the motion to suppress on such grounds should be denied. Suing's statements to Agent Davenport are admissible against Suing and did not taint the Omaha federal search warrants.

### B. Douglas County Attorney Subpoenas

Suing challenges the acquisition of evidence through several administrative subpoenas. Two Douglas County Attorney subpoenas were used to obtain information from Cox Communications, an internet service provider, regarding Suing. Such information was used in obtaining the Omaha federal search warrants. County Attorney subpoenas are authorized by Neb. Rev. Stat. § 86-2,112. There is no evidence such subpoenas were irregularly obtained. Furthermore, assuming, *arguendo,* that state law was violated as

9

Suing claims, any such violation does not offend the federal Constitution. *United States v. Burtton*, 599 F.3d 823, 828 (8th Cir. 2010). Regardless of any claim of irregularity, Suing has no constitutional expectation of privacy in the acquisition of such subscriber information. **See** *United States v. Stults,* 575 F.3d 834, 842 (8th Cir. 2009). **See also** *United States v. McIntyre*, 646 F.3d 1107, 1110 -1112 (8th Cir. 2011) (no expectation of privacy in electric usage records obtained by County Attorney subpoenas). Obtaining the information from Cox Communications via the County Attorney records was lawful and did not violate Suing's constitutional rights.

### C. The Federal Search Warrants

An affidavit for a search warrant must contain probable cause of four ingredients: time, crime, objects, and place. 2 Wayne R. LaFave, *Search & Seizure* § 3.7(d) at 412 (4th ed. 2004). When viewing a search warrant, the court must look at the totality of the circumstances set forth in the affidavit. **See** *id.*; *United States v. Jeanetta*, 533 F.3d 651, 654 (8th Cir. 2008). "Probable cause has been shown if the warrant application and affidavit describe circumstances showing 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Robinson*, 536 F.3d 874, 877 (8th Cir. 2008) (**quoting** *Gates*, 462 U.S. at 238). The Eighth Circuit has explained the issuing magistrate's obligation as follows:

> The task of the issuing magistrate is to make "a practical, **common-sense decision** whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for . . . concluding that probable cause existed." [*Illinois v. Gates*, 462 U.S. 213, 238 (1983)]. When the magistrate relied solely on the affidavit presented to him, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Leichtling*, 684 F.2d 553, 555 (8th Cir. 1982). **Affidavits must be read in "a common-sense and realistic fashion,"** *United States v. Cadwell*, 864 F.2d 71, 74 (8th Cir. 1988)

(**citing** *United States v. Ventresca*, 380 U.S. 102, 108 (1965)). "Deference is accorded an issuing magistrate's probable cause determination . . ." *United States v. Brown*, 584 F.2d 252, 256 (8th Cir. 1978).

*United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995) (emphasis added).

The January 25th search warrant (Exhibit 5) described P2P computer file sharing and its use in child pornography cases. Suing's IP address was identified as having files for sharing child pornography. Those shared files were reviewed and found to contain child pornography. There were no misstatements or omissions in the affidavit affecting probable cause which would warrant any hearing under *Franks v. Delaware*, 438 U.S. 154 (1978).

The application and affidavit was not stale requiring suppression. In paragraph 23 of the Application and Affidavit, Investigator Malicky set forth his basis for believing that such files are stored in the subject computer for some length of time. **See** *United States v. Estey*, 595 F.3d 836, 840 (8th Cir. 2010) (five months); **see also** *United States v. Allen*, 625 F.3d 830, 842-43 (5th Cir. 2010) (eighteen months); *United States v. Frechette*, 583 F.3d 374 (6th Cir. 2009) (sixteen months); *United States v. Lacy*, 119 F.3d 742, 745-46 (9th Cir. 1997) (ten months).

The second search warrant (Exhibit 6) executed on January 27, 2011, was supported by probable cause to believe photographic equipment was present in the residence based upon the evidence seized in the earlier search warrant. No constitutional violation occurred. Suing's motion to suppress should be denied.

### D. Inclusion of Arizona Investigation in Omaha Search Warrants

Assuming, *arguendo*, that some or all of the information from the Arizona investigation was unlawfully obtained, the excision of such information, i.e., paragraphs 46, 47 and 48 in the application and affidavit for the January 25th warrant (Exhibit 5) would not affect the finding of probable cause to search the residence. The information gathered by the Omaha CCTF would, standing alone, provide probable cause to justify the issuance of the search warrant. The Arizona information is simply "icing on the cake." The cake, the balance of the application and affidavit, was fully digestible on its own. Suing's motion to suppress should be denied in its entirety.

**IT IS RECOMMENDED TO CHIEF JUDGE JOSEPH F. BATAILLON that:**

Suing's motion to suppress ([Filing No. 25](#)) be denied.

## ADMONITION

Pursuant to [NECrimR 59.2](#) any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 30th day of September, 2011.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge